**Carol Dregne, Appellant, v. Five Cent Cab Company et al., Defendants, Yellow Cab Company, Appellee.**

**Gen. No. 41,801.**

540

Opinion filed March 18, 1942.  Rehearing denied April 1, 1942.

HOPKINS, SUTTER, HALLS & DEWOLFE, of Chicago, for appellant; DONALD J. DEWOLFE, WILLIAM G. BLOOD and T. EUGENE FOSTER, all of Chicago, of counsel.

KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, of Chicago, for appellee; HOWARD ELLIS, DAVID JACKER, CHARLES M. RUSH and JOHN M. O'CONNOR, JR., of Chicago, of counsel.

MR. JUSTICE HEBEL delivered the opinion of the court.

This is an appeal by the plaintiff from a judgment in favor of the defendant, Yellow Cab Company, entered by the circuit court of Cook county.  At the close of plaintiff's evidence, the court granted a motion for a directed verdict by Yellow Cab Company, and the jury, pursuant to the court's instruction, returned a verdict of not guilty upon which judgment was entered.

Plaintiff brought suit to recover damages for injuries sustained while she was a passenger in a taxicab which ran into the supporting pier of a railroad viaduct in Evanston. There were four other defendants, which are not involved in this appeal; (1) The Five Cent Cab Company; (2) Chicago Yellow Cab Company, Inc., (3) the trustee of the Chicago and North Western Railway Company, and (4) Chicago and North Western Railway Company. Judgment was entered for plaintiff against Five Cent Cab Company for $7,500, the amount of damages assessed by the jury. Neither Five Cent Cab Company nor plaintiff has appealed from that judgment. A verdict was directed for Chicago Yellow Cab Company, Inc., judgment was entered on the verdict, and plaintiff has not appealed with respect to Chicago Yellow Cab Company, Inc. The jury found the trustee of the North Western Railway and the Railway Company not guilty, and judgment was entered on that verdict. Plaintiff has not appealed with respect to those defendants.

This appeal relates solely to Yellow Cab Company. Plaintiff asks for a reversal and new trial against the defendant because of alleged errors of the trial court hereinafter more particularly set forth.

The facts appearing in this case are that plaintiff, Carol Dregne, a young woman 22 years old, went to a moving picture show on Howard street, Chicago, on the evening of March 18, 1937. With her were two other young women, Edna Simonson and Minerva Louison. All three were employed and lived in Evanston. When they came out of the theatre about midnight they hailed a taxicab with the name ''Five Cent Cab Company'' painted on it. They gave the driver the nearest address, the home of Miss Simonson, in the south part of Evanston, where they were driven and where she left the cab. The other young women lived in the northwest part of Evanston, and they then gave the driver their addresses. The cab proceeded north on Ridge avenue

and turned west on Emerson street, and while proceeding west on Emerson street, without any slowing down or warning, the cab crashed into the east end of the supporting pier of a viaduct of the North Western Railway Company which crosses Emerson street just west of Ashland avenue. There was a warning signal on the pier of the ''button reflector'' type, and the street lights were on. The driver's negligence in failing to keep a proper look-out was the cause of the accident, and no witnesses were called by any of the defendants to prove otherwise.

The plaintiff was seriously injured. Her condition was critical for several days, and she lived only because of the splendid surgical and medical care which she received at the Evanston Hospital, where she was taken immediately after the accident. Her skull was punctured just above the base of the nose in such a manner that the attending surgeons were able to see through the torn dura into the brain tissue itself. The base of plaintiff's nose was crushed; her nose and forehead, just above the left eye, were permanently disfigured; her upper front teeth were knocked out; her frontal sinuses were crushed in; her sense of smell was practically destroyed; and she sustained severe lacerations and bruises. She was confined to the Evanston Hospital almost a month and was unable to return to work until about six months thereafter. The jury assessed her damages at $7,500.

The Five Cent Cab Company made no motion for a new trial, made no motion for a remittitur; and the nature and extent of plaintiff's injuries were at no time seriously in issue. The driver's negligence and plaintiff's injuries were established beyond question, and these facts were not in issue on the motion for a directed verdict. The only issue on that motion—and the principal issue of this appeal—was whether Yellow Cab Company should be held accountable for the negligence of Five Cent Cab Company. Plaintiff's suggestion and contention is that the evidence and the

reasonable and natural inferences to be drawn from it show the Five Cent Cab Company was, at the time of the accident and at all times throughout its existence, from its organization, July 1, 1935, to the termination of its business in January or February 1939, a dummy corporation or shell, that it and its affairs were so organized and controlled by the defendant Yellow Cab Company as to make it merely an agency or instrumentality of Yellow Cab Company, and that Yellow Cab Company was responsible for the tortious act of Five Cent Cab Company the same as if a charter never had been granted to that company.

From the evidence introduced at the trial, it appears that on September 28, 1921, Yellow Cab Company entered into a 20-year recorded lease for premises on the corner of Chicago and Kenney avenues in Evanston, at a total rental of $220,000, payable in instalments of $916.67 a month. The lease called for the construction by the lessor of a large garage, and a full year's rental, $11,000, was deposited in escrow as security for rent. Yellow Cab Company used this garage as the headquarters for its Evanston fleet of over 100 taxicabs continuously from November 1, 1921, to July 1, 1935. The superintendent of the garage throughout this period was a man named William J. Hunter. The garage mechanic throughout this period was a man named Mike Conway. The floor superintendent in charge of drivers from 1931 to July 1, 1935, was a man named Bernard J. Schoenfield, a Yellow Cab employee of long-standing, whose employment began with the organization of the company in 1915. Prior to his work at the Evanston garage Schoenfield had been a Yellow Cab starter at the South Shore Country Club. The cashier of the Evanston garage for the period immediately preceding July 1, 1935, was a man named Robert J. Mooney, but just how long Mooney had held that position does not appear from the evidence.

It appears that by the Spring of 1935, the situation in Evanston had become unsatisfactory from the Yel-

low Cab Company's standpoint, and that the company was losing money on the operations from the Evanston garage. It had a lease with a rental of $11,000 a year, with six more years to run. In the Spring of 1935, the Yellow Cab Company decided to change the method of its Evanston operations.

On July 1, 1935, an Illinois charter was issued to the Five Cent Cab Company, the incorporation papers for this new company having been prepared by an attorney for Yellow Cab Company, who had been present at Yellow Cab Company's director's meetings where abandonment of operations from the Evanston garage was decided upon. This attorney (a partner of the law firm which defended Yellow Cab Company on the trial of this cause) was called as a witness by plaintiff and was asked with whom she conferred in connection with preparing the incorporation papers of the Five Cent Cab Company. She answered, " . . . it was Mr. Samuels, Vice-President, or Mr. Bieze, Secretary, (of Yellow Cab Company) called me up and asked me if I would form a corporation for Mr. Hunter, who was then an employee of theirs."

The initial and only capital of the new company was $2,500, which remained unchanged throughout the period the company remained in business, namely, from July 1, 1935 to February 1939. The incorporators were William J. Hunter, Bernard J. Schoenfield and Mike Conway—the garage manager, the floor superintendent and the mechanic of the Evanston garage of Yellow Cab Company for many years prior to the incorporation of the new company. The subscribers to the capital stock, according to the company's minute book, were the same three men, the minutes reciting that they subscribed and paid for common shares as follows:

| Name | No. of shares | Amount |
|------|---------------|--------|
| William J. Hunter | 84 | $840 |
| Bernard J. Schoenfield | 83 | $830 |
| Mike Conway | 83 | $830 |

The stock certificates for the shares were issued in their names in the amounts subscribed. The minute book and stock certificate record show these shares outstanding continuously after July 1, 1935, in the names of these three men. Thereafter no transfers were made or additional shares issued. These same three men were the directors and the only directors through the period the company remained in business, and were the only officers during that period. Hunter was president, Schoenfield, vice-president and treasurer, and Conway, secretary. Schoenfield and Conway testified at the trial. Hunter died in December 1939, over a year before the trial.

Schoenfield, at the time he testified, was an employee of Yellow Cab Company, employed as a "starter" at a hotel cab stand in Chicago. When the Five Cent Cab Company ceased operations early in 1939, Schoenfield returned at once to the employment of Yellow Cab Company. Hunter, likewise, returned to the employment of Yellow Cab Company early in 1939. After Five Cent Cab Company ceased operations, Conway went to the Yellow Cab Company's main offices in Chicago, in February 1939, and applied for reemployment but his application was rejected. At this time he turned in the tools he had used as mechanic of the Evanston garage, and Yellow Cab Company gave him its written receipt for them. Thereafter he obtained employment as a janitor of an apartment building and was so employed at the time of the trial. Both Schoenfield and Conway testified that they were not stockholders of the Five Cent Cab Company, and that they had never put any money into the business. They both testified that they were directors and officers in name only, and that they simply "had a job" at $30 per week. They testified that they had attended no director's meetings; that though they were supposed to be the treasurer and secretary of the company neither of them had anything to do with the books and records of

the company; that they knew nothing of its financial or corporate affairs; and that they took no part in deciding any of the policies of the company. They performed the same duties after July 1, 1935, they had performed for years prior thereto, namely, the duties of floor man and garage mechanic.

It is further called to the attention of this court that on June 30, 1935, the Yellow Cab Company removed its cabs from the Evanston garage. That night Mike Conway went to the Racine avenue garage of the Yellow Cab Company, in Chicago, and placed license plates on a fleet of used repainted cabs bearing the name "Five Cent Cab Company." The next morning, July 1, 1935, these cabs appeared at the Evanston garage, the day operations began under the name "Five Cent Cab Company." Title to the cabs was transferred from Yellow Cab Company through an intermediary named Roy F. Hale, a Yellow Cab Company employee and salesman, to Five Cent Cab Company. A chattel mortgage covering all the cabs and their equipment was executed. This mortgage called for a down payment of only $10 a cab. The total consideration for the 30 cabs including meters and other equipment was $4,500 or $150 a cab. Thereafter, from time to time, further cabs and meters were acquired by Five Cent Cab Company from Yellow Cab Company, and in each instance a chattel mortgage was taken by Yellow Cab Company. After the first transfers the use of an intermediary conduit of title was abandoned and the transfer and mortgage back were made directly between Yellow Cab Company and Five Cent Cab Company. All of the chattel mortgages provided that if the mortgagee at any time felt insecure or unsafe it might at once repossess the mortgaged property. The number of cabs in operation under the Five Cent Cab Company name between July 1935, and February 1939, varied from time to time, beginning with 30 and reaching as high as 55.

The 20-year lease to Yellow Cab Company of the garage premises by its express terms could be assigned or sublet without the consent of the lessor. Nevertheless, Yellow Cab Company did not assign or sublease the premises to Five Cent Cab Company. The minutes of Five Cent Cab Company of July 1, 1935, contain this resolution, "Further resolved, that this corporation shall assume and make payment of the rent provided in said lease, *i. e.* $11,000 per year, and comply with all of the terms of said lease in reference to carrying its own fire insurance, compensation insurance and in all other matters." This lease remained outstanding at the time of trial, and Yellow Cab Company always paid the rent to the lessor. For a short time Five Cent Cab Company may have paid Yellow Cab Company $300 a month rental, but it appears that Yellow Cab Company supplied, and paid for, the garage premises necessary for operation of the Five Cent Cab Company business. The garage equipment, other than cabs, such as tools, etc., which was in the garage prior to July 1, 1935, was left there. The telephone of the Yellow Cab Company remained in the premises. After July 1, 1935 Five Cent Cab Company handled calls for Yellow Cabs by relaying calls to other Yellow Cab stands or garages. On June 28, 1935, Yellow Cab Company applied for a new telephone with a new number to be installed in the Evanston garage, and this phone and number were assigned to Five Cent Cab Company. Plaintiff points out that Yellow Cab Company obtained telephone service for Five Cent Cab Company and used its credit for that purpose. After July 1, 1935, the Yellow Cab Company listing in the telephone directory was continued in its own name and the Evanston address of this garage, and the Evanston address of this garage was continued in the directory as an address of Yellow Cab Company.

After July 1, 1935, the important personnel continued unchanged. Hunter, the manager of fourteen

years standing, remained in charge. The floor superintendent, Schoenfield, continued with the same job. The head mechanic, Conway, stayed on with the same job. Mooney, the cashier, likewise retained the same job.

It appears from the plaintiff's statement of facts that plaintiff's attorneys made diligent efforts to obtain the books and records of Five Cent Cab Company, both by a pre-trial deposition for discovery and by obtaining an order for production of books and records under Rule 17 of the Supreme Court Rules of Practice and Procedure. The motion for production was objected to and fully argued prior to the entry of the order requiring production. After the order had been entered, production was avoided by the filing of an affidavit by one of the attorneys of record for Five Cent Cab Company, stating under oath that he had made a diligent search for the books and records of this company and that they had disappeared and were nowhere to be found. Upon the last day of the trial the law firm representing Yellow Cab Company produced in court two of the records of Five Cent Cab Company, namely, the minute book of the company and the stock certificate record. The two living officers and directors of Five Cent Cab Company both testified that they had never had custody or possession of any of the books or records of the company; had no knowledge of the entries or of the whereabouts of such records and had never had anything whatever to do with such records, notwithstanding the fact, that in name at least, these men were the treasurer and the secretary of the company.

While the books of account and financial records were not obtainable, the minute book, produced on the last day of the trial, does contain material evidence with respect to the history of operations beginning July 1, 1935. The minute book recites that on the day the charter issued, July 1, 1935, a first meeting of the board of directors was held. Two resolutions are con-

tained in the minutes of this meeting; first, a resolution providing that the compensation of Hunter, Schoenfield and Conway should be $50 per week for Hunter, $30 per week for Schoenfield, and $30 per week for Conway; and second, a resolution providing that all checks or other orders withdrawing funds from the company's bank account should be signed by the treasurer and countersigned by either the president or the secretary. These minutes, and in fact all of the minutes, were prepared by an attorney who also represented Yellow Cab Company, and the minute book and the stock certificate record of the Five Cent Cab Company were at all times retained in the physical custody and possession of this attorney and were never in the possession of Conway, the secretary of the company, or either of the other officers. The next entry in the minute book is of the annual meeting of stockholders on January 13, 1936, at which meeting the same men were reelected directors. There was no report of operations for the year just ended. The minute book also contains minutes of an annual meeting of directors on the same day, at which the same men were reelected to the same offices. The only other action taken by the directors, as recited by the minutes, is the fixing of the salaries of these three men at the same figures. The next entry is the minutes of a special meeting of the directors on March 18, 1936, where the purchase of 15 second-hand cabs at prices of $92.50 for five of the cabs and $72.50 for ten of the cabs was ratified. No down payment was to be made for these cabs, and the first payment on the purchase price was not to be made until nine months after the date of acquisition. The next entry is the minutes of a special meeting of the board on December 23, 1936, at which additional compensation for the year 1936 was authorized, as follows; $100 to Hunter, $50 to Schoenfield, $50 to Conway and $50 to Mooney. The next entry is the minutes of the annual meeting of stockholders on January 11, 1937, at

which the only action taken was the reelection of the same directors, there having been no report of operation for the prior year. On the same day there was an annual meeting of directors at which the same officers were reelected and their compensation again fixed for the coming year at the same figures. The next entry is the minutes of an annual meeting of stockholders on January 10, 1938, at which the same men were reelected directors. There was no report of operation for the prior year. On the same day, the minutes show that the annual meeting of directors was held and the same officers were reelected, the only other action having been to fix their salaries again at the same amounts. The final entry in the minute book is the minutes of a special meeting of directors, dated January 24, 1938, containing a resolution authorizing the officers to purchase 25 used taxicabs at a price of $275 per cab, and further authorizing the officers to execute conditional sales contracts or chattel mortgages as security for the purchase price ''in such form as may be satisfactory to the seller of such taxicabs.'' Chattel mortgages covering the purchase of 19 of these cabs recite that they are made pursuant to this resolution of January 24, 1938. The total stated consideration for the 19 cabs was $5,225. There was to be no down payment, but payments were to be made monthly from March 1, 1938, to September 1, 1938, and the monthly payments amounted to $855 per month, exclusive of interest. While the name of the seller and mortgage holder does not appear in the minute book, it does appear in the recorded chattel mortgages, and the seller and chattel mortgage holder was Yellow Cab Company. The foregoing entries are the only entries contained in the minute book after July 1, 1935.

It further appears that in the month of January 1939, the Five Cent Cab Company went out of business. Hunter and Schoenfield at once returned to the employment of Yellow Cab Company. Conway applied for

such employment and was turned down. Yellow Cab Company immediately repossessed the cabs, and miscellaneous equipment such as tools and license plates were turned over to Yellow Cab Company and its receipt issued therefor. Plaintiff points out that the method of operations had come to an end, and when approximately a year before the trial the court entered an order requiring production of the books and records of Five Cent Cab Company, its attorney filed an answer to the rule to show cause, sworn to by him, stating among other things that subsequent to the date of the accident, "The Five Cent Cab Company became insolvent and ceased doing business." The minute book of the company contains no entries whatever after January 24, 1938.

The plaintiff's contention is that the evidence and the reasonable and natural inferences to be drawn from it show the Five Cent Cab Company was, at the time of the accident and at all times throughout its existence, from its organization on July 1, 1935 to the termination of its business in February 1939, a dummy corporation or shell, that it and its affairs were so organized and controlled by the defendant Yellow Cab Company as to make it merely an agency or instrumentality of Yellow Cab Company, and that Yellow Cab Company was responsible for the tortious act of Five Cent Cab Company the same as if a charter never had been granted to that company. As a result, it is further contended that the law imposes liability, irrespective of a separate incorporation, where the evidence shows that justice requires the imposition of liability upon the person in fact and in reality in control of a dummy corporation, citing a number of cases. In the consideration of this contention it is well to have before us the law applicable to the facts as they appear in this record. This court, in the case of *McDermott v. A. B. C. Oil Burner Sales Corp.*, 266 Ill. App. 115, reached the conclusion that it is an elementary and

fundamental principle of corporation law that a corporation is an entity separate and distinct from its stockholders and from other corporations with which it may be connected, and went on to hold that the fact that the stockholders of two corporations are identical, that one owns shares in another, that they have mutual dealings, will not, as a general rule, merge them into one corporation. However, we there held that the legal fiction of distinct corporate existence will be disregarded when necessary to circumvent fraud, or where the corporation is so organized and controlled, and its affairs so conducted as to make it merely an instrumentality of another corporation. Applying this rule to the facts of the instant case, it would be necessary that there be evidence that fraud has been practiced and that the Five Cent Cab Company was so organized and controlled, and its affairs so conducted as to make it merely an instrumentality of Yellow Cab Company. The authorities hold that the mere fact that the stockholders in two or more corporations are the same, or that one corporation exercises a control over the other through ownership of its stock or through identity of its stockholders, does not make either the agent of the other nor does it merge them into one, so as to make a contract of one corporation binding upon the other, where each corporation is separately organized under a distinct charter. It is necessary that we consider and apply these rules of law to the facts in this record in determining the issues between the parties. It is apparent from the authorities and we venture to say that no corporation acting within its powers has been held liable for the debts of another corporation legally organized, because it controlled such corporation by reason of ownership of its stock, or otherwise, except by reason of contract or on grounds of agency, or of estoppel, or because the controlled corporation has been used in such a way that the maintenance of its charter as a separate and distinct entity would work injustice.

It appears from the opinion in the case of *McDermott v. A. B. C. Oil Burner Sales Corp., supra,* (cited to this court) that the court there cited the case of *Davis v. John R. Thompson Co.,* 239 Ill. App. 469, and suggested this later case as supporting the theory of the defendant in the instant case. In the *Davis v. Thompson* case the court said: "Even in cases where a corporation sued owned the whole or practically all of the stock of the corporation which caused an injury, and where such corporation, through the election of its board of directors, had the practical control of the corporation causing the injury, still, unless the corporation sued actually possessed or operated, through its board of directors, the corporation that caused the injury, or there was a joint partnership operation, the corporation sued has been held not liable . . . The mere fact that two corporations may have certain persons who are managing officers in both corporations, in and of itself, will not render one corporation liable for injuries caused by the other." So, in the discussion of the facts before us, it does not appear that Yellow Cab Company owned any of the capital stock of Five Cent Cab Company, nor was there any such ownership as to justify this court in concluding, by reason of any such ownership, that a relationship of agency existed between the two corporations. There was no corporate contract entered into or contractual interest existing between the corporations, nor is there any element shown which would indicate that fraud was practiced by the use of the Five Cent Cab Company corporate entity. The Yellow Cab Company's only interest, so far as we can find from the evidence, was its contractual interest by reason of the chattel mortgages securing the unpaid purchase price of taxicabs sold to Five Cent Cab Company. These chattel mortgages were for the protection of Yellow Cab Company for the amount due from Five Cent Cab Company on the purchase of these taxicabs, and, of course, contained the provision that if the mortgagee at any time felt inse-

cure it had the right to take possession of the mortgaged property.

From the evidence as detailed and presented, we can find nothing from which we can determine that there was an estoppel sufficient to justify holding the Yellow Cab Company liable. The plaintiff did not think she was taking a Yellow Cab, nor was there any holding out by either company that they had any connection with each other.

The facts appearing in this record with all inferences arising therefrom are to be considered in the light most favorable to the plaintiff, the party against whom the motion for directed verdict is directed. In considering these facts, with all the legitimate and natural inferences to be drawn from them, it must appear, before holding that error was committed in sustaining the motion for directed verdict, that they are sufficient to justify the court in concluding that there had been *prima facie* evidence presented which should have been submitted to the jury. We have examined this record carefully for the purpose of determining what the Yellow Cab Company did which would justify the submission of the case to the jury. On the contrary, under the evidence and the law as called to our attention, it would seem that the Yellow Cab Company did nothing which would raise a presumption sufficient that the jury should pass upon it. We are all familiar with the general rule that where defendant makes a motion to instruct the jury to find for the defendant, the court is to only consider whether or not there was any evidence, which, with all reasonable inferences therefrom, viewed in the light most favorable to the plaintiff, tended to prove the material allegations of the complaint or some count thereof. This court in *Gillett v. Williamsville State Bank,* 310 Ill. App. 395, said:

"Upon a motion of the defendant for a directed verdict, the Court can only determine whether or not there

was any evidence, which, with all reasonable inferences therefrom, viewed in the light most favorable to the plaintiff, tended to prove the material allegations of the complaint or some count thereof. If there was such evidence, it became the duty of the Trial Court to deny the defendant's motion for a directed verdict and to submit controverted issues of fact to the jury, subject only to the giving of proper written instructions by the Court as to the law applicable thereto. A motion to direct a verdict should be allowed if, when all the evidence is considered, with all reasonable inferences to be drawn therefrom in its aspect most favorable to the party against whom the motion is directed, there is a total failure to prove one or more necessary elements of the case.''

When we come to consider as to whether there is any evidence of fraud that would involve Yellow Cab Company, we would like to call attention to the fact that Five Cent Cab Company, at the time of the accident, carried automobile liability insurance in its own name. The fact that later the insurer company was liquidated by the State Director of Insurance, does not act to impose liability where none before existed. The plaintiff further contends that Five Cent Cab Company was organized for the purpose of permitting Yellow Cab Company to get out of its lease. The Yellow Cab Company's lease was still in force and had not expired when Five Cent Cab Company took possession, but the fact that Five Cent Cab Company took possession did not relieve Yellow Cab Company from its liability to pay rent. The facts in the record show that Yellow Cab Company paid the rent and was still paying it at the time of the trial, and there is nothing to warrant the conclusion that the failure to assign or sublet to Five Cent Cab Company would relieve the Yellow Cab Company of its written liability under its lease.

One of the questions involved in this controversy is as to whether or not William J. Hunter was the con-

trolling factor behind Five Cent Cab Company or whether it was Yellow Cab Company. That Yellow Cab Company was the controlling factor was not borne out by the evidence and witnesses heard at the trial. The two witnesses, Schoenfield and Conway, who testified on this question, stated that Hunter was the boss, that he organized the company and asked them to work for him, and so did the witness Cleveland, who prepared the incorporation papers for Hunter. It does appear from the testimony of witness Conway that he was not favorable to Yellow Cab Company, but, even he testified that Hunter was the boss. Plaintiff further contends that there was a ''fair inference'' from the testimony of the assistant treasurer and secretary of the Yellow Cab Company that the Yellow Cab Company supplied the original $2,500 in cash capital. When we come to examine this evidence it appears that this witness answered in effect ''no'' to the question as to whether or not Yellow Cab Company contributed any money to Hunter or the Five Cent Cab Company for the purpose of capital. As a fact, therefore, the evidence does not support the suggestion of plaintiff that the capital was supplied by Yellow Cab Company.

It does appear from the facts in this record that Yellow Cab Company aided certain ex-employees to form their own cab business, as Yellow Cab was closing its Evanston garage because it was losing money there, and wished to salvage something on the rental payments it was bound to make on the vacated garage. There is nothing, however, to indicate that the Yellow Cab Company exercised control over the Five Cent Cab Company, and it is essential, to establish that the Yellow Cab Company had control over the operations of Five Cent Cab, to prove facts which show that it had such control by an agreement with Five Cent Cab Company covering to some extent the operation of the business. From the facts as we have them in this

record, there was no such agreement. As is well said by defendant, a promoter of a corporation is not liable for its torts, and, in promoting a corporation of the character and kind of Five Cent Cab Company, the Yellow Cab would not be liable at the time of this accident for plaintiff's damages unless it actually controlled the Five Cent Cab Company. That does not appear from this record.

There are other questions called to the attention of this court but in view of the conclusion we have reached it will not be necessary to pass upon them. The judgment that was entered by the court upon the verdict of the jury finding defendant Yellow Cab Company, not guilty, returned pursuant to the court's instruction at the close of plaintiff's evidence, is affirmed.

*Judgment affirmed.*

BURKE, P. J., and KILEY, J., concur.